IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| ANRY ARZUMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:06-CV-04015-NKL |
| | ) | |
| MISSOURI DEPARTMENT OF | ) | |
| NATURAL RESOURCES and | ) | |
| STATE OF MISSOURI, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

Plaintiff Anry Arzuman ("Arzuman") has brought suit against Defendant Missouri Department of Natural Resources ("Department") for violations of Title VII. Pending before the Court is the Department's Motion for Summary Judgment [Doc. # 40]. For the reasons stated herein, the Department's Motion is granted.

**I.    Factual Background[1]**

Arzuman is an Azerbaijan-born man who worked for the Department at its Kansas City Regional Office ("KCRO") as an Environment Engineer III ("EEIII") from September 2001 to August 12, 2005. During Arzuman's employment, Jim Macy was the KCRO Director. Arzuman was supervised by James Helgason. In turn, Arzuman

---

[1] To resolve the motion for summary judgment, the Court considers only those facts that are material and relevant. This factual overview contains both contested and uncontested facts. When contested, the facts are viewed in the light most favorable to Arzuman, the nonmoving party.

1

supervised Cheryl King (from September 2001 through December 2001) and Tanya Black[2] (beginning December 18, 2001). Both King and Black were employed at the Environmental Engineer II level.

Prior to Arzuman's interview for the EEIII position, Macy told Arzuman that he would have to support Macy's office politics, which included resolving certain problems with King, whose employment would soon end. Arzuman understood–and found acceptable–that his success at the Department "would depend on how [Arzuman] would be able to work with [Macy] on [the King issue] or similar issues in the future." (Def's SOF ¶ 10). Macy implied that Arzuman had been hired either because he is a minority or because of his national origin.

During several meetings in 2001, 2002 or 2003, Macy stated or implied that Arzuman was a product of communism. Macy indicated that he would be Arzuman's mentor and teach him "how to live in this country, how to adjust [his] communist mentality toward life in this country." (Arzuman Depo. at 76:12-17).

During many of their interactions, but not more than once each week, Macy would criticize Arzuman's English. Arzuman believed Macy was making fun of him when he asked Arzuman to repeat himself. Macy once told Arzuman that he would like to put a picture of a former employee on the wall to commemorate that employee's accomplishments in the English language. Macy also requested that Arzuman make eye

---

[2] Tanya Black is formerly known as Tanya Fells. Throughout this Order, she is referred to as Tanya Black.

2

contact with him during conversations. He would sometimes tell Arzuman to "keep [his] chin up" when he talked to him. During the course of the "chin up" conversations, Macy sometimes touched Arzuman on the chin or clapped his shoulders. Arzuman described the frequency of the touching as follows: "On the chin it could have been two or three times, but clapping on the shoulders, that was frequent at some point. In 2004 I think [Macy] even actually grabbed my arm." (Arzuman Depo. at 94:21-25). And, in the immediate aftermath of September 11, 2001, Macy, after learning that the police were concerned about Arzuman's strolls around the parking lot, told Arzuman not to walk in certain areas.

Arzuman testified that Macy would often "give [me] static" when they met and that "[i]t was my understanding that [Macy] always wants to hurt me." (Arzuman Depo. at 102:10-11). Macy told Arzuman that he was not a good manager and that immigrants, generally, are not good managers. On more than one occasion in 2005, Macy threatened to fire Arzuman. Arzuman did not believe that Macy would fire him because the Department would have difficulty finding an engineer to replace him. During private conversations, Macy often told Arzuman to "shut up." Arzuman testified that Macy threatened that "he would find the ways how to restrain me, how to, you know, punish me." Arzuman, however, did not testify as to the specifics of this threat. Arzuman also testified that Macy told him that he would fire him if it were not for the fact that doing so would upset the distribution of minorities in the Department. Macy created a peer review evaluation form that was designed to help supervisors obtain feedback from the

3

employees they supervised. The evaluation form included an area where an evaluator could comment on an individual's English communication abilities. One day, Arzuman found a copy of a peer review evaluation form in his mailbox. On the form, Arzuman "found some statement that [he should] just go learn English." (Arzuman Depo. at 138:14-21).

Arzuman testified that Macy's offensive conduct began in 2001, but Arzuman did not complain until June 27, 2003. After Arzuman's June 2003 complaint, Valerie Johnson conducted a mediation between Arzuman and Macy. At some point, Arzuman was offended when Johnson told him that his perception of the world was different from Macy's or hers. Arzuman concedes that the mediation helped Macy and him "re-establish our good personal relationship (since our working relationships have never suffered)." (Def's Ex. B at 2672).

Arzuman also had conflicts with Black, his subordinate. When Black replaced King, Macy told Arzuman that he would have to do work for Black because she was more "administrative than technical." (Arzuman Depo. at 67:2-25). In September 2003, Macy and Arzuman agreed that Arzuman needed to be more involved in supervising Black. Specifically, Arzuman needed to communicate directly with Black about work-related issues.

Arzuman's early evaluations rated him as "highly successful" and one noted that Arzuman "completed more construction permits to compensate for the time lost due to [Black's administrative duties]." (Performance Appraisal Summary at 950). Later years'

4

evaluations were not as kind. Arzuman's November 23, 2004 evaluation for the period from July 1, 2003 to June 30, 2004 indicated that "Arzuman is working to improve relations with [Black]." (Arzuman Depo. Ex. 6). Notwithstanding Arzuman's efforts, the evaluation form gave Arzuman an "improvement expected" rating on supervision and noted that there was tension and conflict in Arzuman's relationship with Black. Though his overall rating was "successful," Arzuman responded to the evaluation by writing directly on the form that: "If there is any tension it is only a direct result of the [unclear] negative attitude of certain individuals toward me that they have to work on!!" (Arzuman Depo. Ex. 6). Similarly, Arzuman's evaluation for the period July 1, 2004 to June 30, 2005 gave Arzuman an overall rating of "improvement expected" and indicated that "Arzuman does not effectively communicate with subordinate, supervisor or Regional Director." (Arzuman Depo. Ex. 7).

Arzuman testified that Macy ordered him to give Black the highest possible evaluation, even though Arzuman did not agree that Black deserved the rating.[3] Specifically, Arzuman testified that Macy and he "had an argument about that once because I mentioned to Mr. Macy that I'm given lower performance evaluations for all my work and what I do, why would I have to give Ms. Tanya Black high performance evaluations?" (Arzuman Depo. at 252:18-23).

Macy threatened to find someone, such as Black, to "report" Arzuman to human

---

[3] Arzuman did not indicate when, or if, he actually gave Black the highest possible evaluation.

5

resources. For her part, Black told Arzuman that management considered him to have limited supervisory power and, on occasion, Black would go to Arzuman's office and ask him to leave the Department.

Arzuman was frustrated by the fact that Black rarely sought his advice. Arzuman was also generally frustrated by Black who "would come to my office to provoke scandal. That would happen every time after I submit complaints. She could come, she would bring me applications, for example, for City of Overland Park for Engineer II." (Arzuman Depo. at 258:9-14). Arzuman testified that, on one occasion, Black told him that immigrants were not good supervisors.

On several occasions, Arzuman asked that his supervisory responsibilities end. In the alternative, Arzuman asked that he be allowed to supervise more individuals. He felt that Black was unfairly portraying his abilities as a supervisor.

On August 23, 2004, Macy contacted Johnson to request an investigation after he received an email from Arzuman alleging that immigrants were treated unfairly at KCRO and that Macy was threatening him. Debbie Harris conducted the subsequent investigation. Harris met with Arzuman for nearly four hours. Three days after Macy contacted Johnson, Arzuman emailed Harris to tell her the problem with Macy had been resolved. Arzuman filed his first charge of discrimination with the EEOC on September 8, 2004. In it, he alleged that Macy harassed and retaliated against him.

On November 10, 2004, during a meeting with Deputy Division Director Fawks, Macy and Helgason, Arzuman repeatedly interrupted Fawks. Arzuman was offended by

Fawks, who "probably came to our office, screamed at me, said to get out of this office, that he did not want to see me in his eyes or get out immediately of this building and not to come back." (Arzuman Depo. at 122:2-6). Arzuman was placed on administrative leave with pay for two hours on November 10 and for a full work day on November 12.

Helgason told Arzuman that he was ashamed to be his supervisor because whenever Arzuman's name would come up, so would Helgason's.

On May 4, 2005, Helgason, Black and Arzuman met so that Helgason could relay to Arzuman information he learned at a coordination meeting that Arzuman was unable to attend. During their meeting, Arzuman repeatedly interrupted Helgason. At one point, Helgason slammed his hand on a desk. In addition, Arzuman testified that Helgason would not invite him to any engineering meetings, though he would invite Black. And, Arzuman testified that "Helgason started picking on me pretty badly after August of 2004." (Arzuman Depo. at 304:18-20).

Though Arzuman had previously complained about his treatment, he filed his first internal complaint on March 23, 2005. He filed a second complaint on March 29, 2005. Arzuman filed additional complaints on May 13, 2005 and May 20, 2005.

Prior to May 25, 2005, Macy told Arzuman that a new performance evaluation system would be implemented that would focus less on purely technical skills and more on interpersonal communication skills and other factors. Arzuman interpreted Macy's communication as a threat. On May 25, 2005, a few months prior to his resignation, Arzuman was issued a written reprimand because he argued with Helgason during a

7

meeting and refused to accept management's decision,[4] did not discuss a timesheet issue with Black after being instructed to do so, and because of the nature of his communications with Black, which were primarily through email.

Sometime after May 25, 2005, Macy and Helgason discussed with Arzuman the Department's progressive discipline policy, which requires supervisors to follow up with employees who have received a written reprimand, provide guidance or feedback on improving performance, and review the employee's progress.

After receiving the written reprimand, Arzuman filed a grievance. Arzuman filed additional grievances on July 28, 2005; July 29, 2005; and July 30, 2005. Arzuman's final performance review was approved on July 19, 2005. Arzuman was given an "improvement expected" rating.

Arzuman's salary was never decreased and he was never transferred or demoted while he worked for the Department. Arzuman resigned via email on August 3, 2005. Prior to his resignation, employees would frequently ask him why he was still at work and would indicate that they believed he was going to be fired.

Arzuman found his work environment stressful. In addition, Arzuman stopped taking prescribed medication for his depression, and was having difficulty sleeping. While working full time at the Department, Arzuman was also writing his PhD

---

[4] Arzuman requested a particular software program for his computer. Macy and Helgason denied the request. Rather than emailing or discussing the issue further with them, Arzuman discussed his wish to have the software during a meeting on an unrelated matter. Even after he perceived that Helgason was angry, Arzuman continued to explain his request for the software.

8

dissertation and providing 20 hours per week of caretaking to his mother. The day before his resignation, Arzuman sent Helgason an email that stated: "I may need 2-3 week vacation starting Aug. 16, 2005 to resolve some family problems. Please let me know if there are any problems with that." The next day, Helgason replied to Arzuman's vacation request, stating: "That would be fine. Please place the annual leave on your calendar in Lotus Notes. Thank you." Despite having received permission to take two to three weeks vacation to deal with family problems, Arzuman resigned via email approximately six hours after receiving Helgason's email approving the vacation request.

After his resignation, Arzuman filed his second charge of discrimination with the EEOC. In it, he alleges that the Department discriminated and retaliated against him because of his race and national origin.

## II. Discussion

Arzuman's Complaint asserts three claims against the Department, including disparate treatment and hostile work environment in violation of Title VII (Count I), retaliation (Count II) and denial of constitutional rights (Count III). Count III was dismissed pursuant to the Court's August 30, 2006 Order.

### A. Arzuman's Disparate Treatment Claim

Arzuman claims that "Defendant subjected Plaintiff to different terms and conditions of employment based upon Plaintiff's national origin and race." (Complaint, ¶ 22). Arzuman may survive the Departments' Motion for Summary Judgment on this claim in one of two ways. First, Arzuman may offer proof of "direct evidence" of

9

discrimination. *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004). Second, even if Arzuman lacks direct evidence of discrimination, he may avoid summary judgment by "'creating the requisite inference of unlawful discrimination' through the familiar three-step burden-shifting analysis originating in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973)." *Russell v. City of Kansas City, Missouri*, 414 F.3d 863, 866-67 (8th Cir. 2005) (quotation omitted). Regardless, Arzuman must show that he suffered an adverse employment action. *See Libel v. Adventure Lands of America, Inc.*, 482 F.3d 1028, 1034 (8th Cir. 2007) ("[D]irect evidence is evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action."); *Tenge v. Phillips Modern Ag Co.*, 446 F.3d 903, 910 (8th Cir. 2006) (holding that to establish a prima facie case of disparate treatment under Title VII, a plaintiff must show (1) he is a member of a protected class, (2) he was meeting his employer's expectations, (3) he suffered an adverse employment action, and (4) similarly situated employees outside the protected group were treated differently).

Arzuman argues that he was constructively discharged by the Department. It is well settled that a constructive discharge is an adverse employment action. *Thompson v. Bi-State Dev. Agency*, 463 F.3d 821, 825 (8th Cir. 2006). A constructive discharge occurs when an employer deliberately makes the employee's working conditions intolerable, thereby forcing the employee to quit. *Baker v. John Morrell & Co.*, 382 F.3d 816, 829

10

(8th Cir. 2004). To prove that he was constructively discharged, Arzuman must show that (1) a reasonable person in his situation would find his working conditions intolerable, and (2) the Department intended to force him to quit. *See Carpenter v. Con-Way Cent. Express, Inc.*, 481 F.3d 611, 616 (8th Cir. 2007). The second element may be met by showing his resignation was a reasonably foreseeable consequence of the Department's discriminatory actions. *Id*. at 617 (quotation omitted).

Arzuman had significant personality conflicts with both his superiors and a subordinate. Notwithstanding these personality conflicts, no evidence suggests that Arzuman found his work conditions intolerable. In his resignation email, Arzuman wrote: "I have spent four unforgettable years and, perhaps, learnt something new. I had tried to do my best in promoting the principle and practices of engineering in this office so severely lacking engineering manpower . . . I, however, still hope that the new reorganized Field Services Division will address this lack of manpower and often expertise. This office employs many good and honest people that have deserved much bettre [sic] positions, and I hate to leave you, mon sher amis." Arzuman's letter suggests that he was frustrated by the Department's lack of manpower, but does not suggest that he found his work environment intolerable. *West v. Marion Merrell Dow, Inc.*, 54 F.3d 493, 498 (8th Cir. 1995) (holding that "frustration and embarrassment . . . do not make work conditions sufficiently intolerable to constitute constructive discharge).

In addition, no evidence suggests that the Department intended to force him to quit. Though Arzuman received a written reprimand, he was never demoted or

11

transferred and his salary was never decreased. And, though Arzuman filed complaints on a regular basis, nothing suggests that the Department undertook any punitive actions against him. At the time of his resignation, Arzuman's life was stressful. He was working full time at the Department, writing his dissertation and serving as his mother's caretaker, all at the same time. The day before his resignation, Arzuman requested and was granted two to three weeks of vacation so he could deal with undisclosed family difficulties. The fact that the Department granted Arzuman two to three weeks of vacation so that Arzuman could address his non-work related troubles refutes Arzuman's claim that the Department tried to force him out. *See, generally, Davis v. KARK-TV, Inc.*, 421 F.3d 699, 706 (8th Cir. 2005) ("An employee who quits without giving her employer a reasonable chance to work out a problem has not been constructively discharged.").

Arzuman has not shown that his work conditions were intolerable; nor has he shown that the Department intended to force him to quit. Thus, Arzuman was not constructively discharged. Other than constructive discharge, Arzuman has alleged no adverse employment action to support his disparate treatment claim. Therefore, summary judgment is granted as to Arzuman's disparate treatment claim.

B. **Arzuman's Hostile Work Environment Claim**

To establish a hostile work environment based on his national origin or race,[5]

---

[5] Though Arzuman claims race-based discrimination, he has submitted evidence only of harassment based on his national origin. No reasonable juror could find, based on this record, that any harassment that did occur was based on race.

12

Arzuman must prove that: (1) he was a member of a protected group; (2) he was subjected to unwelcome national origin-based or race-based harassment; (3) the harassment was because of his national origin or race; (4) the harassment affected a condition, term or privilege of his employment; and (5) his employer knew or should have known of the harassment and failed to take prompt and effective remedial action.  *Diaz v. Swift-Eckrich, Inc.*, 318 F.3d 796 (8th Cir. 2003).

The Department argues that the national origin or race-based harassment of which Arzuman complains did not affect a condition, term or privilege of Arzuman's employment because it was not objectively hostile.  The Court concludes that no reasonable juror could disagree.

For Arzuman's work environment to be actionable it must be objectively hostile to a reasonable person and subjectively hostile to Arzuman.  *Sallis v. Univ. of Minn.*, 408 F.3d 470, 476 (8th Cir. 2005).  The conduct at issue "must be extreme and not merely rude or unpleasant."  *LeGrand v. Area Resources for Community & Human Servs.*, 394 F.3d 1098, 1101 (8th Cir. 2005); *Sallis*, 408 F.3d at 477 (holding that "rude" or "insensitive" conduct is insufficient to support a claim for hostile work environment).  To determine if a work environment is hostile or abusive, courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Sallis*, 408 F.3d at 477 (citing *Elmahdi v. Marriott Hotel Servs., Inc.*, 339 F.3d 645, 653 (8th Cir. 2003)).

13

Macy's comments about Arzuman being a communist, having imperfect English, that immigrants are bad supervisors, and his restriction on where Arzuman should walk; Black's comment that immigrants are not good supervisors; and the actions of the unnamed individual who placed an anonymous peer review in Arzuman's mailbox were rude and unpleasant, but not so extreme as to make Arzuman's work environment objectively hostile. The comments, though inappropriate, were isolated in nature and insufficient to constitute severe or pervasive harassment under Eighth Circuit precedent. *See Duncan v. General Motors Corp.*, 300 F.3d 928, 931 (8th Cir. 2002) (holding that fellow employee's "boorish, chauvinistic, and decidedly immature" conduct did not constitute a hostile work environment); *Klein v. McGowan*, 198 F.3d 705, 709 (8th Cir. 1999) ("Simple teasing, offhand comments, and isolated incidents generally cannot amount to severe or pervasive harassment.").

In addition, there is no evidence that Macy's threat to terminate Arzuman, or touching him on the chin and shoulder, or Helgason and Fawks's yelling at Arzuman, occurred because of Arzuman's national origin or race. Thus, Arzuman has not made out a prima facie case of Title VII hostile work environment. Summary judgment is granted as to this claim.

### C. Arzuman's Retaliation Claim

As with his discrimination claim, Arzuman bears the burden of establishing a prima facie case in his retaliation claim. After the Supreme Court's decision in *Burlington Northern*, to establish a retaliation claim, Arzuman must show (1) he engaged

14

in protected conduct; (2) a reasonable employee would have found the challenged retaliatory action materially adverse; and (3) the materially adverse action was causally linked to the protected conduct. *Burlington N. & Sante Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2415 (2006).

Arzuman engaged in protected conduct when he filed numerous grievances and complaints with the Department and the EEOC. Arzuman claims the Department retaliated against him by lowering his performance evaluations, allowing general hostility towards him and by constructively discharging him. In a previous section, the Court found that Arzuman was not constructively discharged. And, Arzuman has not submitted any evidence from which the Court could conclude that any of the general hostility directed towards Arzuman was causally linked to Arzuman's protected conduct. *See, generally, Higgins v. Gonzales*, 481 F.3d 578, 589 (8th Cir. 2007) ("Title VII does not set forth a general civility code for the American workplace.").

As for the Department's decision to lower Arzuman's performance evaluation, no reasonable juror could find the decision was based on Arzuman's national origin. Proximity in time between Arzuman's complaints and his job evaluations does not establish a prima facia case of retaliation. In addition, the Department has presented a legitimate non-discriminatory reason for Arzuman's evaluation. *Haas v. Kelly Services, Inc.*, 409 F.3d 1030, 1035 (8th Cir. 2005) (citations omitted) (setting forth the burden-shifting framework); *Eliserio v. United Steel Workers of America Local 310*, 398 F.3d 1071, 1078 (8th Cir. 2005). The Department bears only the burden of production, not the

15

burden of persuasion. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089 (1981).

The Department argues that Arzuman's lowered performance evaluations were justified because Arzuman was not meeting the Department's expectations. Specifically, Arzuman was not effectively communicating with his subordinate (Black) and other colleagues. The Department's concerns with respect to Arzuman's communication abilities are fully described on his performance evaluations.

Arzuman argues that the Department's stated reason for his lower performance evaluations is pretext for unlawful retaliation. Arzuman writes, "In this case there are direct statements that Macy wanted to get rid of plaintiff. Employees were told that Arzuman would be fired. The continued harassment and treatment of plaintiff proves this." (Opposition at 40). However, none of Arzuman's arguments establish that the Department wanted to fire him because of his national origin. Arzuman testified that Macy said that he wanted to get rid of him, but Arzuman did not believe Macy was serious. The Department on more than one occasion tried to resolve the conflict in the Department even after Arzuman filed his complaints. This is not consistent with a finding that the Defendants wanted Arzuman out because he filed a discrimination complaint. Arzuman has submitted no evidence that any employee was told that Arzuman would be fired because he engaged in a protected activity, and Arzuman was told the Department did not want to let him go because he was a minority. Given this record, no reasonable juror could conclude that the Defendants lowered Arzuman's evaluation because of his

16

national origin. Summary judgment is granted as to this claim.

## III. Conclusion

Accordingly, it is hereby

ORDERED that the Department's Motion for Summary Judgment [Doc. # 40] is GRANTED.

s/ Nanette K. Laughrey  
NANETTE K. LAUGHREY  
United States District Judge

Dated: May 31, 2007  
Jefferson City, Missouri